THE STATE OF OHIO, APPELLANT, *v.* SPEER, APPELLEE.

[Cite as *State v. Speer*, 124 Ohio St.3d 564, 2010-Ohio-649.]

*Trials — Criminal procedure — Jurors — Competence — Hearing-impaired juror not per se incompetent to serve — Hearing-impaired juror must be able to perceive and understand all evidence presented — Presence of juror who cannot perceive and understand all evidence deprives defendant of fair trial — In deciding challenge for cause to impaired juror, court must determine whether any reasonable accommodation can be made to enable juror to serve competently.*

(No. 2009-0330 — Submitted November 17, 2009 — Decided March 3, 2010.)

APPEAL from the Court of Appeals for Ottawa County, No. OT-07-046,

180 Ohio App.3d 230, 2008-Ohio-6947.

_____

SYLLABUS OF THE COURT

1.  In deciding a challenge for cause to a prospective juror on the basis of a physical impairment, the court must determine, in light of the specific evidence to be presented, whether any reasonable and effective accommodation can be made to enable the juror to serve. In making that determination, the court must balance the public interest in equal access to jury service against the right of the accused to a fair trial, the latter being the predominant concern of the court.

2.  The right to a fair trial requires that all members of the jury have the ability to understand all of the evidence presented, to evaluate that evidence in a rational manner, to communicate effectively with other jurors during deliberations, and to comprehend the applicable legal principles as

instructed by the court.  An accommodation made to enable a physically impaired individual to serve as a juror must afford the accused a fair trial.

3.  A hearing impairment by itself does not render a prospective juror incompetent to serve on a jury, but when the accommodation afforded by the court fails to enable the juror to perceive and evaluate the evidence, the accused is deprived of a fair trial.  To avoid such situations, a trial court must determine whether reasonable accommodations will enable an impaired juror to perceive and evaluate all relevant and material evidence, and when no such accommodation exists, the court must excuse the juror for cause.

_____

**O'DONNELL, J.**

{¶ 1}  This case highlights the tension between an accused's right to a fair trial and the interest of the judicial system in providing equal access to the courts, not just for some, but for all citizens, including those with impairment or disability.  Although this court has promoted access to the judicial system, including the opportunity for those with disabilities to serve as jurors, the superior right of an accused to receive a fair trial requires that each member of a jury be able to perceive and evaluate all of the evidence presented.  Because the accommodation made in this case was insufficient to enable the hearing-impaired juror to consider all of the relevant and material evidence presented to the jury, the accused did not receive a fair trial.  Accordingly, the judgment of the court of appeals is affirmed, but the rule of law promulgated by the appellate court does not accurately set forth the applicable principle of law and is disapproved.

**Facts and Procedural History**

{¶ 2}  The evidence presented at trial reveals that in August 2002, Scott A. Speer and Jim Barnett worked for Repair Products Unlimited, a company that manufactures vinyl repair kits.  Speer, the factory supervisor, and Barnett not only

2

had a working relationship, but the two were also close friends, often boating and travelling together.

**{¶ 3}** Nonetheless, Speer and Barnett occasionally had disagreements over money that Speer owed Barnett. On August 3, 2002, Speer had Barnett working on one of his boats at Bass Haven Marina. Ken Henning, who owned a mobile home at Bass Haven, heard Barnett complain that Speer owed him $10,000 for work he had performed and that Barnett would not leave Lake Erie without this money. According to Henning, Speer stormed off the boat. Henning heard the men continuing to argue in the early morning hours the next day.

**{¶ 4}** On the evening of August 5, 2002, after Speer and Barnett had spent the day working on one of Speer's boats, they decided to travel to Put-in-Bay on South Bass Island. Although they had planned to spend the night on the island, Speer could not find a hotel room, and as a result, they decided to return to Bass Haven. Speer recognized that the winds and waves posed a concern, but he believed he could safely navigate the lake in his 24-foot small craft.

**{¶ 5}** Returning from Put-in-Bay to East Harbor in the early morning hours of August 6, 2002, Speer encountered four- to six-foot waves. While standing in the boat and refusing to sit down, Barnett fell or was pushed from the boat near Mouse Island, just off Catawba Point. Speer called out to Barnett and spent about 20 minutes looking for him.

**{¶ 6}** Speer then called 9-1-1 from his cell phone and spoke to the Ottawa County Sheriff's Department and the Coast Guard. He reported that Barnett had fallen into the lake and that he had attempted to throw a line but had failed to reach Barnett. Speer also stated that he could not see Barnett and that his location was near the spot where Barnett had fallen. However, he said that he could not stay at that location due to the wave action against his craft, and he therefore returned to East Harbor. At that point, the call ended.

**{¶ 7}** The Coast Guard discontinued its search for Barnett. The next day, Speer, Roger Young (Barnett's brother), and Terry Keen (the boyfriend of Barnett's sister) took Speer's boat to Mouse Island to search the shoreline. Young and Keen walked the island and discovered Barnett's body washed up on the shore. Keen signaled to Speer on the boat and dialed 9-1-1 to advise the Coast Guard that they had located Barnett's body.

**{¶ 8}** Samuel DeWalt, an area supervisor for the Ohio Department of Natural Resources, investigated the incident and filed a report with the Division of Watercraft on August 30, 2002, concluding that Speer's alcohol use, speed, and reckless operation had contributed to Barnett's death. Although DeWalt forwarded a copy of his report to the Ottawa County Prosecutor's office, the state did not charge Speer.

**{¶ 9}** Testimony at trial revealed that in the summer of 2003, Speer allegedly admitted to William Seese, a friend with whom Speer had occasionally shared drugs, that he had pushed Barnett off the boat. Seese did not immediately report Speer's statement to the local authorities. However, a member of Barnett's family contacted DeWalt in June 2003, informing him that Seese might have information about the incident. Investigators did not locate Seese until July 2004, at which time he informed them of Speer's admission.

**{¶ 10}** On March 1, 2006, the Ottawa County Grand Jury indicted Speer on counts of aggravated vehicular homicide and involuntary manslaughter. On February 27, 2007, a second grand jury returned a separate indictment on counts of aggravated murder and murder. The trial court consolidated the two cases for trial before a visiting judge.

**{¶ 11}** During voir dire, a venireman, Linda Leow-Johannsen, told the court that she suffered from a hearing impairment, explaining that she could hear voices, but could not understand spoken words without reading the speaker's lips. She admitted that she might miss information if the speaker did not face her and

that she would "have a problem" if counsel played an audio tape. Knowing that the state intended to present an audio recording during its case-in-chief, the court nonetheless denied Speer's motion to excuse her for cause, stating that it would accommodate her impairment by permitting her to sit where she could see the faces of the witnesses and by telling her to advise the court if she missed anything. The court further arranged for her to read the court reporter's real-time transcription of the audio tape.

{¶ 12} As part of its case-in-chief, the state played the audio tape recording of the 9-1-1 call for the jury; Leow-Johannsen read the court reporter's real-time transcription of it as it played.

{¶ 13} During opening and closing arguments, the prosecutor urged jurors to consider the "calm tone" of Speer's voice and his demeanor during the 9-1-1 call as evidence of his guilt. The state also emphasized that Speer had operated the boat recklessly by piloting it while under the influence of alcohol. In closing arguments, counsel for Speer denied the state's contention that Speer had operated his craft under the influence of alcohol and pointed out that Speer did not slur his speech on the 9-1-1 tape.

{¶ 14} Following deliberations, the jury acquitted Speer of aggravated murder and murder, but found him guilty of aggravated vehicular homicide and involuntary manslaughter. The trial court determined the two convictions to be allied offenses of similar import and sentenced Speer only on the aggravated-vehicular-homicide conviction to a four-year term of incarceration.

{¶ 15} On appeal, the court of appeals reversed Speer's convictions and held that the trial court had erred by not excusing the hearing-impaired juror for cause. The appellate court noted that "there is no way to determine whether [the juror] was aware of every time someone was speaking" and that "it is unknown whether the juror received all the testimony." *State v. Speer*, 180 Ohio App.3d 230, 2008-Ohio-6947, 904 N.E.2d 956, ¶ 30. "[M]ore troubling" for the court,

however, was the fact that the state had relied on the 9-1-1 tape to prove an element of the crime; jurors were asked to consider Speer's speech patterns and other audio clues in evaluating that evidence, which would have been meaningful only if actually heard: "mere written words would not have conveyed the nuance and inflection imparted by the spoken words." Id. at ¶ 33.

{¶ 16} The appellate court promulgated the following rule of law in its opinion: "If any doubt exists that a juror can adequately and completely perceive and evaluate all the evidence, whether because of a physical impairment, mental capabilities, or other reason that would interfere with the performance of a juror's duties, the trial court must excuse that juror for cause." Id. at ¶ 34.

{¶ 17} The state appealed to this court, contending that a trial court does not abuse its discretion by impaneling a hearing-impaired juror when the court reasonably and in good faith believes that it can accommodate the juror's disability. Moreover, it emphasizes that the Ohio Trial Court Jury Use and Management Standards set forth in the Rules of Superintendence provide that jury service should not be denied or limited on the basis of disability.

{¶ 18} Speer contends that the right of an accused to a fair trial outweighs the public interest in accommodating a juror with a disability to serve on a jury, and he further asserts that the trial court's accommodation in this case did not enable her to evaluate all the evidence presented at trial.

{¶ 19} Accordingly, we are called on to weigh an accused's right to a fair trial against the public interest in equal access of all persons to jury service, regardless of disability.

### Public Access to Courts

{¶ 20} This court has led efforts to ensure that all persons, including the disabled, have access to the courts and the opportunity to serve on juries. The Rules of Superintendence for the Courts of Ohio promulgated by this court provide that "[t]he opportunity for jury service should not be denied or limited on

the basis of * * * disability." Id., Appendix B, Ohio Trial Court Jury Use and Management Standards, Standard 1(A). In promulgating this standard, this court recognized "the obligation of every court to reasonably accommodate the special needs of physically handicapped jurors." Commentary to Standard 1. The duty of jury service falls on all citizens, and, therefore, it is "vitally important that the legal system open its doors to each person who desires to serve on a jury." Id.

{¶ 21} Moreover, in 2003, this court established the Supreme Court of Ohio Interpreter Services Program, which works with courts on the issue of interpreters, parties and witnesses with limited English proficiency, and hearing-impaired individuals in the Ohio court system. The Interpreter Services Program has sponsored courses on American Sign Language and on understanding deafness, and it has also created and distributed a Handbook for Ohio Judges on Interpreters in the Judicial System and a bench card for judges on working with interpreters in the courtroom.

{¶ 22} With these and other initiatives, this court has demonstrated its commitment to ensure that no individuals are excluded from the courts on the basis of disability, whether as parties, witnesses, or jurors. But in every case, including those involving accommodations for jurors, the trial court must ensure that all jurors will be able to afford the accused a fair trial.

{¶ 23} In this case, the trial court accommodated Leow-Johannsen by placing her in the front of the jury box nearest the witnesses, by directing counsel, the parties, and witnesses to face her when they spoke so that she could read their lips, and by allowing her to read the reporter's transcript of the 9-1-1 tape when the state played it for the jury. The court thus attempted to comply with the Rules of Superintendence when it impaneled Leow-Johannsen and rejected Speer's challenge for cause.

**The Right to a Fair Trial**

**{¶ 24}** Despite the efforts of the trial court to accommodate Leow-Johannsen, Speer did not receive a fair trial. Regrettably, the accommodation made by the trial court in this instance could not help Leow-Johannsen to effectively perceive or evaluate Speer's demeanor, detect any slurred speech or the lack of it, or consider the loudness or softness of his voice, the patterns of his speech, his tone – whether excited, calm, or passive – or the inflections of the voices on the 9-1-1 tape.

**{¶ 25}** The right to a fair trial requires that all members of the jury have the ability to understand all of the evidence presented, to evaluate that evidence in a rational manner, to communicate effectively with other jurors during deliberations, and to comprehend the applicable legal principles as instructed by the court. An accommodation made to enable a physically impaired individual to serve as a juror must afford a fair trial to the accused. See generally *United States v. Dempsey* (C.A.10, 1987), 830 F.2d 1084, 1088-1089; *Woodard v. Commonwealth* (Ky.2004), 147 S.W.3d 63, 69; *People v. Guzman* (1990), 76 N.Y.2d 1, 6, 556 N.Y.S.2d 7, 555 N.E.2d 259.

**{¶ 26}** A hearing impairment by itself does not render a prospective juror incompetent to serve on a jury, but when the accommodation afforded by the court fails to enable the juror to perceive and evaluate the evidence, an accused cannot receive a fair trial. To avoid such situations, a trial court must determine whether reasonable accommodations will enable an impaired juror to perceive and evaluate all relevant and material evidence, and when no such accommodation exists, the court must excuse the juror for cause.

**{¶ 27}** Here, both the state and the defense relied on the 9-1-1 tape as evidence relevant to whether Speer had committed the charged offenses. The state suggested that Speer's "calm tone" and his "demeanor on the 9-1-1 tape" provided evidence of his guilt. Speer's defense counsel denied the state's contention that Speer had operated his craft under the influence of alcohol by

pointing out that the 9-1-1 tape did not show Speer slurring his speech at the time of the call. Leow-Johannsen's hearing impairment directly affected her ability to perceive and evaluate that evidence because she only read the colloquy from a real-time transcription.

{¶ 28} Further, the accommodation made by the trial court in this case of allowing Leow-Johannsen to read the court reporter's transcript did not provide her any means to effectively discern the demeanor, speech patterns, voice inflections, or excitement or lack of it as reflected in the voice modulations or other audio clues on the 9-1-1 tape. Because she could not perceive whether there was urgency in Speer's voice, whether he slurred his speech, or whether he sounded deceptive or hesitant, she could not include such evaluations in rendering her verdict.

{¶ 29} Therefore, the trial court abused its discretion in denying Speer's challenge of her for cause. Her impairment directly prevented her from completely evaluating the specific evidence from the 9-1-1 recording presented in this case and relied on by both the state and the defense. Although promoting access to the courts is and should be a primary concern for the judiciary, the trial court's paramount duty is to ensure that the accused is afforded a fair trial.

{¶ 30} Thus, the court of appeals correctly determined that the trial court abused its discretion in not excusing Leow-Johannsen and properly reversed the judgment of the trial court. However, the test the appellate court articulated for determining whether an impaired juror may serve on a jury is overbroad in that it focuses on whether "*any doubt* exists that a juror can adequately and completely perceive and evaluate all the evidence." (Emphasis added.) We disapprove of this standard. Instead, in deciding a challenge for cause to a prospective juror on the basis of a physical impairment, the court must determine, in light of the specific evidence to be presented, whether any reasonable and effective accommodation can be made to enable the juror to serve. In making that determination, the court

must balance the public interest in equal access to jury service against the right of the accused to a fair trial, the latter being the predominant concern of the court.

{¶ 31} In ruling on a challenge for cause to a hearing-impaired juror, a court must excuse the juror when it determines that no reasonable accommodation exists to enable the juror to perceive and evaluate all of the evidence directly bearing on the guilt of the accused. Accordingly, the judgment of the court of appeals is affirmed.

Judgment affirmed.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, and O'CONNOR, JJ., concur.

LANZINGER and CUPP, JJ., dissent.

———————————

**LANZINGER, J., dissenting.**

{¶ 32} After a thorough review of the record, I conclude that the trial court did not abuse its discretion when during voir dire it declined to remove for cause the hearing-impaired juror. Accordingly, I dissent from the majority's decision and would reverse and remand the case to the court of appeals.

<strong>I. Trial Court Proceedings</strong>

{¶ 33} A jury found Speer guilty of both involuntary manslaughter and aggravated vehicular homicide. On appeal, Speer argued that the trial court erred when it failed to disqualify a hearing-impaired juror for cause. The record discloses how this juror came to be seated and was accommodated, and the facts are important to consider.

<em>Voir Dire</em>

{¶ 34} During voir dire, the trial court and the parties directed questions to the hearing-impaired juror, Linda Leow-Johannsen. At one point, she stated that she could not read the judge's lips, but said that it would not affect her during the trial:

{¶ 35} "[The Court]: Do you think that [your car being stolen] will affect you somehow here?

{¶ 36} "[Leow-Johannsen].  I can't read your lips.  Move your files.

{¶ 37} "[The Court].  Let me move over so you can see me.  Will that affect you in this case?

{¶ 38} "A.  No.

{¶ 39} "Q.  I notice, Ms. Leow, that you and I have some problems communicating, and I want to make sure that you can hear or understand or listen to and see whatever it was that you need to see to get the evidence.

{¶ 40} "Do you think you can do that?

{¶ 41} "A.  Yeah.

{¶ 42} "Q.  Good.  If you are selected as a juror, and you have any problems, you have trouble knowing what the witness is saying, you tell me, and I will make sure that you get a chance to see it.  Okay?

{¶ 43} "A.  No problem."

{¶ 44} Later, when Leow-Johannsen responded to a question regarding whether any of the jurors had boating experience, she asked the court to repeat one question:

{¶ 45} "[Leow-Johannsen].  I haven't been on a boat for so long.  I owned my own boat 2001, Baja.

{¶ 46} "[The Court].  And you drive the boat yourself?

{¶ 47} "A.  I am sorry, what?

{¶ 48} "Q.  I am not a boater.  Is the term drive –

{¶ 49} "A.  Drive or operate, yes."

{¶ 50} Both the prosecutor and defense counsel questioned the juror regarding her hearing impairment during voir dire.  First, the prosecutor asked what accommodations the potential juror may need:

{¶ 51} "Q. One question for Ms. Johannsen. Are you familiar with – you read lips?

{¶ 52} "A. Yes, yes.

{¶ 53} "Q. If I am standing this way and the witness –

{¶ 54} "A. I can't read them if you look that way. I don't know what you said, but this way, I am okay.

{¶ 55} "Q. Is there any other assistance that the Court could give you in understanding what is going on, someone who does sign language?

{¶ 56} "A. I read lips.

{¶ 57} "Q. As long as someone is facing this way, you can?

{¶ 58} "A. I can see. Yes.

{¶ 59} "Q. All right. Thank you. If there is an audio tape, then –

{¶ 60} "A. – then I will have a problem.

{¶ 61} "Q. What do you normally use?

{¶ 62} "A. For the tape, you mean? You mean, for the T.V.?

{¶ 63} "Q. Well, if there is something where you don't have lips available to read, how do you know –

{¶ 64} "A. If somebody has close captioning, then I can read off of it. I can do that."

{¶ 65} Later, defense counsel questioned Leow-Johannsen regarding her hearing impairment and specifically asked about tape-recorded evidence:

{¶ 66} "Q. Sometimes lawyers get excited when they are doing things, and you can read my lips, right?

{¶ 67} "A. Right.

{¶ 68} "Q. But you can't hear?

{¶ 69} "A. I can hear you, but I have to read the lips.

{¶ 70} "Q. So if I were to turn the wrong way to pick something up, you could miss a question?

{¶ 71} "A.  Right.

{¶ 72} "Q.  Okay.  But you could always see what the answer was.  You just might not know what the question is unless we are all very, very, very careful.  Is that what you are telling me?

{¶ 73} "A.  Yes.  If you turn your back, I can't read your lips.

{¶ 74} "Q.  Okay.  And I know Ms. Croy [the prosecutor] got into this a little bit.  I am sure some of the evidence is going to be tape recorded.  How is it that we could accommodate you on that?  If we are going to play a tape and the tape is going to be words, no lips, obviously, what do you need in order for us –

{¶ 75} "A.  – type it down for me.

{¶ 76} "Q.  Something like that our court reporter could do for you?

{¶ 77} "A.  Yes."

{¶ 78} The record also indicates instances during voir dire in which this juror engaged in conversation with the court and attorneys without any apparent communication problems.

*For-Cause and Peremptory Challenges*

{¶ 79} Before exercising any peremptory challenges, both the prosecution and defense were given opportunities to challenge jurors for cause.  The defense stated that it wished to challenge Leow-Johannsen for cause:

{¶ 80} "MR. DAVIDSON:  * * * I am concerned about Linda Leow.

{¶ 81} "THE COURT:  Is that the juror who has a hearing impairment?

{¶ 82} "MR DAVIDSON:  Yes, Your Honor.

{¶ 83} "My position on that subject is that if any of us turn our backs on her in asking our questions, she will be able to read the lips of whatever witness is there, but if we happen to turn around or do anything where she misses something, I am concerned that she is not going to hear all the evidence.  And she is a nice, friendly lady, and I am concerned that given, that she maybe – I am sure she misses about five percent of everything in her life and fills the rest in.

{¶ 84} "THE COURT:  What is the State's position?

{¶ 85} "MS. CROY:  I think that is not a challenge for cause.  The State does not consent to a challenge for cause.  It is not one of the bases.

{¶ 86} "THE COURT:  It is not a statutory basis, and the Courts have made accommodation for persons with various kinds of impairment.  I am going to deny the challenge for cause.  You can exercise a peremptory challenge.

{¶ 87} "MR. DAVIDSON:  I understand.

{¶ 88} "MR. BUZZELLI [defense co-counsel]:  While we are on the subject, is it possible to get her some type of accommodation?

{¶ 89} "THE COURT:  We will try in every way we can, but I can't guarantee that we will always be successful."

{¶ 90} The defense then proceeded to exercise all four of its allotted peremptory challenges on other jurors.

*Accommodations*

{¶ 91} The court made multiple accommodations to assist the juror during the trial.  The court had originally seated the jurors in the order of the numbers assigned to them, which meant that Leow-Johannsen was in the fifth chair in the front row of the jury box.  At the suggestion of the prosecutor, the court moved Leow-Johannsen closer to the witnesses:

{¶ 92} "THE COURT:  Ms. Johannsen, we want to assist you in every way that we can.  I think we could start by having you trade places with Ms. Elliott, if you would not mind.  This way, if at any time, you have any difficulty, raise your hand.  Where there is material that is only on an audio tape, we will have you come down and sit next to the court reporter who is writing it on a screen, and you will be able to read what she writes on a screen.  (Court reporter indicating.)"

{¶ 93} It is important to recognize that defense counsel offered no objection to either the juror's seating arrangement or the court's proposed accommodations.

{¶ 94} During the state's case, the prosecutor asked the court's permission to play a 9-1-1 tape recorded on the evening Speer was alleged to have committed the homicide. After the defense declined to offer an objection to the tape, the trial court stated, "At this point Ms. Johannsen has moved to watch the screen of the court reporter. You may proceed to play the tape." The tape was then played to the jury, while Leow-Johannsen watched the court reporter's transcription. The defense did not object to the accommodation given to the juror by the trial court.

{¶ 95} After the jury had begun deliberations, the jury submitted a question asking the court to provide a written transcript of the 9-1-1 call for Leow-Johannsen. Both the prosecution and the defense agreed that the juror should be given a transcript.

### Motion for New Trial

{¶ 96} After the jury's verdict was announced, Speer filed a motion for new trial. The first issue raised involved the trial court's decision to allow Leow-Johannsen to remain on the jury after the defense's voir dire objection: "The government and trial court denied defendant of his Ohio and U.S. Constitutional right to a fair jury trial by allowing Juror #1 to sit in judgment over defendant's case, over objection, without making any accommodations to assist her in "hearing" or obtaining the verbal and audio evidence adduced at trial nor in assisting her during deliberations." (Underlining sic.) Speer argued that the court failed to make necessary accommodations, which resulted in the juror's inability to fully hear witnesses and the 9-1-1 tape. In a footnote, he argued that the trial court should have provided Leow-Johannsen with assistive listening devices. In summary, Speer argued that he did not receive a fair trial because the juror did not have equal access to the testimony and evidence introduced at trial.

**{¶ 97}** The trial court denied Speer's posttrial motion for new trial. The court first stated that neither the state nor the defense inquired about the extent of the juror's hearing disability or the exact extent to which she relied upon lip reading to supplement any residual hearing. Second, the court noted that neither party complained during the trial that the juror was missing any testimony and that neither party requested any further accommodations for the juror's disability. Finally, the court noted that the defense did not request that an alternate juror replace Leow-Johannsen or file a motion for a mistrial on grounds that the juror was unable to understand or appreciate evidence. The court thus dismissed the defendant's argument that the juror's hearing impairment might have caused her to miss some testimony or the full content of the 9-1-1 recording as "general speculation" and denied the motion.

**{¶ 98}** The court of appeals held that because the state had directed the jury during its closing argument to consider Speer's "demeanor" on the 9-1-1 tape, the state was asking the jurors to listen for voice inflections or signs of insincerity during the taped call to show that Speer had acted with a mental state of purposefulness or recklessness. *State v. Speer*, 180 Ohio App.3d 230, 2008-Ohio-6947, 904 N.E.2d 956, at ¶ 32. It then concluded that since a hearing-impaired juror would be unable to fully perceive the nuances of the 9-1-1 tape, the tape is "the kind of evidence that could not be adequately or effectively evaluated by a hearing-impaired juror." Id. at ¶ 33.

## II. No Abuse of Discretion

**{¶ 99}** The determination of whether a prospective juror should be disqualified for cause is a discretionary function of the trial court, and the trial court's determination will not be reversed on appeal unless there has been an abuse of discretion. *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus. "The opportunity for jury service should not be denied or limited on the basis of * * * disability." Rules of Superintendence for the Courts of Ohio,

Appendix B, Ohio Trial Court Jury Use and Management Standards, Standard 1(A). Thus, "[i]t is the obligation of every court to reasonably accommodate the special needs of physically handicapped jurors." Id. at Commentary. While trial courts must accommodate disabled jurors to serve on juries whenever possible, this responsibility is subject to the defendant's due process and fair-trial rights. Thus, R.C. 2313.43 provides that any juror may be challenged on any cause "that may render him at the time an unsuitable juror."

{¶ 100} Based upon these principles and upon my review of the record, I would hold that the trial court did not abuse its discretion in refusing to dismiss Leow-Johannsen for cause. Although the majority is correct in stating that a court's primary concern is ensuring that an accused has a fair trial, we cannot require trial courts to be clairvoyant. Instead, when faced with a challenge for cause, the trial court must have full discretion to analyze the salient facts and rule accordingly. Here, the trial court, prosecution, and defense all had opportunities to question the juror regarding the extent of her hearing disability. She indicated that she would be able to read lips to augment her hearing, and in response to a question by defense counsel stated that if a tape recording were to be played for the jury, she would be able to understand it by reading the court reporter's typed transcription of the tape.

{¶ 101} Furthermore, attorneys are charged with protecting the interests of their clients. The defense was presented with a number of opportunities to object to the accommodations afforded to Leow-Johannsen, yet never raised any objection during the trial. In holding that the trial court abused its discretion, the court of appeals and the majority conclude in hindsight and contrary to the case record that this juror was unable to adequately or effectively evaluate the 9-1-1 tape. This conclusion, however, does not consider that the defendant raised this objection only after the completion of the trial. The defendant did not object

17

when the 9-1-1 tape was played to the jury and did not then request that Leow-Johannsen be replaced by an alternate juror.

{¶ 102} " ' "[A] defendant is entitled to a fair trial but not a perfect one," for there are no perfect trials.' " *Brown v. United States* (1973), 411 U.S. 223, 231, 93 S.Ct. 1565, 36 L.Ed.2d 208, quoting *Bruton v. United States* (1968), 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476, quoting *Lutwak v. United States* (1953), 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593. The standard set forth by the majority's opinion comes dangerously close to encouraging trial courts to dismiss disabled jurors outright rather than risk reversal on appeal.

{¶ 103} The record indicates that when the trial court decided the challenge for cause, the only argument raised against the juror was the defense counsel's concern that Leow-Johannsen might not hear all the evidence if an attorney or witness turned away from the jury box. Defense counsel's argument in support of the challenge for cause thus focused on the juror's ability to understand the witness testimony, not on her ability to hear the tone and inflection of the voice on the 9-1-1 tape. The trial court weighed the defense's concern against all information gathered in the voir dire proceedings and acted within its discretion in determining that it would be able to accommodate Leow-Johannsen.

{¶ 104} While I would hold that the trial court did not abuse its discretion in this case, I wish to emphasize that trial courts must carefully consider a defendant's rights to due process and a fair trial when determining whether a person with a particular disability may serve on a jury. In this case, the trial court determined that Leow-Johannsen could perceive and comprehend the trial proceedings, provided that she received certain accommodations. Under different circumstances, a trial court may appropriately grant a challenge for cause after determining that a person's disability prevents that person from perceiving and comprehending the evidence presented at trial. "Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability

18

impartially to consider evidence presented at a trial." *Batson v. Kentucky* (1986), 476 U.S. 79, 87, 106 S.Ct. 1712, 90 L.Ed.2d 69. It is important that discretion to make this assessment remains with the trial court, which is in the best position to weigh all information and circumstances before it. See *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 187 ("[U]nder our system it is [the trial] judge who is best situated to determine competency to serve impartially").

### III. Conclusion

**{¶ 105}** Based on the record, the trial court's decision to deny the challenge for cause to Leow-Johannsen did not reach the level of an abuse of discretion. I therefore respectfully dissent and would reverse and remand the case to the court of appeals for determination of the remaining assignments of error.

CUPP, J., concurs in the foregoing opinion.

_____

Mark E. Mulligan, Ottawa County Prosecuting Attorney, for appellant.

Bradley Davis Barbin; and Maguire & Schneider, L.L.P., and Mark R. Meterko, for appellee.

Richard Cordray, Attorney General, Benjamin C. Mizer, Solicitor General, Elisabeth A. Long, Deputy Solicitor, and Samuel Peterson, Assistant Solicitor, urging reversal for amicus curiae Ohio Attorney General.

Ohio Legal Rights Service and Jane P. Perry, urging reversal for amici curiae Ohio Association of the Deaf, Communication Services for the Deaf, Ohio School for the Deaf, and Ohio Legal Rights Service.

Marc P. Charmatz, Rosaline Crawford, Barbara Raimondo, and Michael S. Stein, urging reversal for amicus curiae National Association of the Deaf.

Thomas J. Zraik, urging reversal for amicus curiae Ability Center of Greater Toledo.

_____